UNITED STATES BANKRUPTCY COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

BEFORE THE HONORABLE PATRICIA M. MAYER, JUDGE

| | |
|---|---|
| In Re: | ) Case No. 23-11688-pmm |
| | ) Chapter 7 |
| MARK LESLIE KENNEDY, | ) |
| | ) |
| Debtor. | ) |
| | ) |
| | ) |
| NANCY BERRIAN, | ) Adversary Proceeding |
| | )  No. 23-00067-pmm |
| Plaintiff, | ) |
| | ) <u>TRIAL</u> |
| v. | ) |
| | ) |
| MARK LESLIE KENNEDY, | ) |
| | ) |
| Defendant. | ) October 2, 2024 |
| | ) Reading, Pennsylvania |

<u>Appearances</u>:

 For the Plaintiff:     Karen Hoffman
                        Ellenberg Law Group
                        1500 JFK Boulevard, Suite 1825
                        Philadelphia, Pennsylvania  19102
                        (215) 790-1682

 For the Defendant:     Charles Laputka
                        Laputka Law Office
                        1344 West Hamilton Street
                        Allentown, Pennsylvania  18102
                        (610) 477-0155

Digital Court            United States Bankruptcy Court
Reporter:                Eastern District of Pennsylvania
                         Office of the Clerk
                         Keith Borzillo
                         The Gateway Building
                         201 Penn Street, Fourth Floor
                         Reading, Pennsylvania  19601
                         (610) 208-5047

Certified Electronic
Transcriber:             Susan Palmer, CERT 00124

          Proceedings recorded by digital recording;
 transcript produced by federally-approved transcription service.

2

<u>I N D E X</u>

Opening Arguments:

       On behalf of the Plaintiff:   page  4
       On behalf of the Defendant:   page  5

Witnesses:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Nancy Berrian |  |  |  |  |
| By Ms. Hoffman: | 7 |  | 53 |  |
| By Mr. Laputka: |  | 29 |  |  |
| Mark Leslie Kennedy |  |  |  |  |
| By Ms. Hoffman: | 54 |  |  |  |
| By Mr. Laputka: |  | 69 |  |  |

Exhibits Received in Evidence:

    Plaintiff's 1, 3 through 7,
     13 and 14, and Defendant's A - D:        page 73

Motion for judgment on partial findings,
 pursuant to FRCP 52:                           page 73

       Argument on behalf of the Plaintiff:   page 73
       Argument on behalf of the Defendant:   page 76

*Trial* 3

1

2                          P R O C E E D I N G S

3          THE CLERK:  All rise.  The United States Bankruptcy

4    Court in the Eastern District of Pennsylvania is now in session,

5    the Honorable Patricia Mayer presiding.

6          THE COURT:  Good morning.

7          MR. LAPUTKA:  Good morning, Your Honor.

8          MS. HOFFMAN:  Good morning, Your Honor.

9          THE COURT:  Just a minute.

10          Okay, why don't we — go ahead.

11          THE CLERK:  I'll call matter number 1:  Berrian versus

12    Kennedy, regarding the trial.

13          THE COURT:  All right.  Why don't we get everyone's

14    appearances.  Ms. Hoffman.

15          MS. HOFFMAN:  Good morning, Your Honor.  Karen Hoffman

16    for the Plaintiff Nancy Berrian.

17          THE COURT:  Okay.

18          MR. LAPUTKA:  Good morning, Your Honor.  Charles

19    Laputka for the Debtor/Defendant Mark Kennedy.

20          THE COURT:  All right.  So is there anything that we

21    need to do before we start?  Any motions that I need to know

22    about?

23          MS. HOFFMAN:  No, Your Honor.

24          THE COURT:  Oh, good.  Okay, I was hoping you'd say

25    that.  All right.  Well, then, Ms. Hoffman, you can proceed.

*Opening Statement on behalf of the Plaintiff*                    4

1          MS. HOFFMAN:  Thank you, Your Honor.  I haven't

2    appeared in this Court before.  Would you prefer I...

3          THE COURT:  It's whatever you're comfortable with.

4    Usually if you have exhibits, it's easier for you to be up

5    there, but if you want to do it from the table, that's fine too.

6          MS. HOFFMAN:  All right.  Thank you.

7          <u>OPENING STATEMENT ON BEHALF OF THE PLAINTIFF</u>

8          MS. HOFFMAN:  Your Honor, I represent Nancy Berrian,

9    the Plaintiff in this action.  Today we're going to show that

10   the Defendant Mark Kennedy, the debt that he incurred to her is

11   not dischargeable in bankruptcy because it was incurred by

12   fraud.  Mr. Kennedy, as a no-show, made repeated representations

13   that he would complete the work at Ms. Berrian's house, that he

14   agreed to in the contract.  He made those representations with

15   recklessness as to whether they were true or false.  Made them

16   repeatedly and repeatedly failed to follow through.

17         He didn't even bother to apply for permits.  He didn't

18   advise her that his business was dissolving.  He intended to

19   induce her to act.  He took her money repeatedly and did not do

20   the work.  She justifiably relied on those representations.

21   And, as we'll show, she incurred damages of at least $44,000.

22   Mr. Kennedy then refused to return the money he had paid — she

23   had paid despite having completed the bare minimum of work.

24         So at the conclusion today, we will be seeking a

25   declaration by the Court that this debt is nondischargeable

*Opening Statement on behalf of the Defendant*                      5

1    under the Bankruptcy Code.   Thank you.

2          THE COURT:   Okay.   Mr. Laputka.

3          OPENING STATEMENT ON BEHALF OF THE DEFENDANT

4          MR. LAPUTKA:   Your Honor, I think we have several

5    issues in the case before the Court this morning.   I think the

6    first issue that the Plaintiff has to overcome is that this is

7    even a debt that is owed by Mr. Kennedy at all.

8          Ms. Berrian contracted with Mr. Kennedy's LLC and

9    there is a very clear contract signed by Ms. Berrian.   Plaintiff

10   just made a comment about the fact that he didn't even bother to

11   apply for permits.   Well, the contract says that he wasn't going

12   to and that that's her responsibility.   So we have a writing.

13   Anything outside of the four corners of this writing is

14   irrelevant for today's matter.

15         Additionally, my client appeared, started to begin

16   work, and then was given a very onerous demand of change orders

17   from allegedly Ms. Berrian's neighbor coming to look at the

18   project.   My client said that he would agree to do these change

19   orders if she would agree to pay for the change orders.   She

20   wanted everything done without any additional payments or

21   amendments to the actual contract.   At that point my client had

22   — she was — at that point, my client was removed from the

23   property.   He was told not to return.   He could not do any more

24   work.

25         He was given a portion of the money for this job.   He

*Opening Statement on behalf of the Defendant*                6

1   was not given the entire amount.  He did have time, materials,

2   labor for employees into this job at the time that his

3   employment was terminated by the plaintiff.  And he even sought

4   counsel as to what he should do prior to interacting with her.

5          He then wrote her a letter giving her her options as

6   she was terminating the contract and he complied with everything

7   that he was entitled to comply to.  As part of the corporation,

8   there is no liability to my client individually.  At most, there

9   was a contract with the corporation which my client was ready,

10  willing, and able to fulfill, but Ms. Berrian had a change of

11  heart and wanted additional things done.  And she unilaterally

12  terminated the contract.

13         That's the evidence that we have we'll put before the

14  Court this morning.  And that's all for now.  Thank you, Your

15  Honor.

16         THE COURT:  Okay.  Ms. Hoffman, do you want to call

17  your first witness?

18         MS. HOFFMAN:  Yes, Your Honor.  I would like to call

19  Ms. Berrian.

20         Ms. Berrian, if you could.  Thank you.

21         THE REPORTER:  Please raise your right hand.

22         MS. BERRIAN:  Okay.

23         THE REPORTER:  Please raise your right hand.

24           NANCY BERRIAN, PLAINTIFF, SWORN/AFFIRMED

25         THE WITNESS:  Yes.

*Berrian - Direct/Hoffman*                                         7

1          THE REPORTER:  State your name and spell your whole

2    name for the record.

3          THE WITNESS:  It's Nancy Berrian.  Do you want the

4    first name and last name spelled?

5          THE REPORTER:  Please.

6          THE WITNESS:  N-a-n-c-y B-e-r-r-i-a-n.

7          THE COURT:  Nancy.

8          THE WITNESS:  Um-hum.

9                        DIRECT EXAMINATION

10   BY MS. HOFFMAN:

11   Q.  Good morning, Ms. Berrian.

12   A.  Hi.

13   Q.  You've already given your full name.  Could you give us your

14   address, please?

15   A.  506 Farmview Road, Easton, Pennsylvania 18040.

16   Q.  And is Easton, is it also possibly another township that you

17   were —

18   A.  Forks Township, within Easton.

19   Q.  All right.  Thank you.  And how long have you lived at that

20   address?

21   A.  I think it's three and a half years now.

22   Q.  All right.  How did you come to know the Defendant in this

23   case?

24   A.  He was referred to me by a friends of mine, Michael Miller

25   and Drew McCarthy, because he was already working on their

*Berrian - Direct/Hoffman*                                    8

1  house.

2  Q.  Okay.  And did you know him as a — only as an individual or

3  also as a company that he —

4  A.  I knew him strictly with his contracting business, but I

5  knew his wife through the former apartment building that I lived

6  in with Mr. Miller and Mr. McCarthy.

7  Q.  Okay.  And what was the name of this business?

8  A.  DSK Properties, I believe, LLC.

9  Q.  Okay.  And do you remember roughly when you first met with

10  Mr. Kennedy?

11  A.  It had to have been, I think, March of 2021, because I was

12  going to be closing on my house at that time.

13  Q.  Okay.  And at that first meeting that you had with him, did

14  he give you any indication on when he would be able to start

15  working on your house?

16  A.  No.  As I said, he was already working on Michael and Drew's

17  house, so I think that was going to be determined once we had a

18  contract in place.  But he did say at that time that he would

19  try to start the work as soon as I closed on my house.

20  Q.  Okay.  And do you know when you signed a contract with DSK?

21  A.  Oh, it was probably March 26th, I think.

22  Q.  Of that year?

23  A.  Of that year.

24  Q.  Okay.  Did the Defendant make any assurances as to when the

25  interior work would be completed?

*Berrian - Direct/Hoffman*                                           9

1    A.  I was supposed to move in in June, so he was supposed to

2    start, you know, the work prior to my move in.

3          MS. HOFFMAN:  Okay.  So I'm just going to show you an

4    exhibit, show you something.  See if this works.

5          THE WITNESS:  Okay.

6          MS. HOFFMAN:  So this —

7          THE COURT:  You turn — yeah.

8          MS. HOFFMAN:  Okay.  Thank you.

9    BY MS. HOFFMAN:

10   Q.  Okay.  So, Ms. Berrian, I'm going to show you this document

11   that's previously been marked as P-1.

12   A.  Um-hum.

13   Q.  Do you recognize what's on here?

14   A.  Yes.

15   Q.  And please —

16   A.  Sorry.

17   Q.  Sorry.  Can you describe it?

18   A.  Yeah.  So the first check for $25,000, as it says March

19   26th, that was when he had me sign the contract.  I was the only

20   one who signed it.  And then he asked for the remainder of the

21   deposit.  And so that was presented on April 5th.

22   Q.  Okay.  There it is.  And so you signed the contract on March

23   26th, —

24   A.  Um-hum.

25   Q.  — you gave him the check for 25,000.

*Berrian - Direct/Hoffman*                                              10

1   A.   Um-hum.

2   Q.   When did he, if ever, when did he come to your home to — to

3   do work?

4   A.   He did not.  Around the end of March, after I had closed for

5   the house, I was speaking with Michael and — Miller.  And we

6   were discussing the fact that, you know, Mark had said he would

7   start the day I closed or the day — I'm sorry — the day after I

8   closed on my house.  He hadn't.  And so Michael said:  I will

9   speak to him on your behalf to see if I can get him to your

10  house.

11          MR. LAPUTKA:  I'm going to object, Your Honor.  This

12  is hearsay.

13          THE WITNESS:  I do have a copy of the text.  I don't

14  know if that is admissible.

15          THE COURT:  Ms. Hoffman, did you want to respond to

16  the objection —

17          MR. LAPUTKA:  No, no.  I —

18          THE COURT:  All right.  I'll sustain the objection.

19  Why don't you ask her a different question.

20          MS. HOFFMAN:  Well, — okay.

21  BY MS. HOFFMAN:

22  Q.   Okay.  So just to clear that up, because there was an

23  objection there, so you said that Mr. Kennedy had said he would

24  begin working on your house the day after you signed — or, sorry

25  — the day after you closed?

*Berrian - Direct/Hoffman*                                    11

1    A.   Correct.

2    Q.   All right.

3    A.   Um-hum.

4    Q.   Okay.  And then so when did he actually come and start

5    working on your house?

6    A.   There was a day when he showed up, I don't know the exact

7    date.  It was end of March, beginning of April.  And I believe I

8    terminated our — or were trying to terminate the contract around

9    April 15th or 16th.  So there was a date at that time when he

10   did appear at the house with one worker, I believe his name was

11   Terrance, and they cleaned out my garage and tore down — I had a

12   sun room that had paneling.  And so they — Terrance was the only

13   one who did the work.  And he was there for just one day.

14   Q.   Okay.  I'm going to show you some more documents here.  All

15   right.  All right, so this is the document previously marked as

16   P-4.  And, Ms. Berrian, do you recognize what's in this?

17   A.   Yes.

18   Q.   What is it?

19   A.   This is on the interior of my home.  That was the living

20   room window.

21   Q.   And did you take this picture?

22   A.   I took the picture, correct.  Yeah.

23   Q.   And so this, relative to your previous testimony, does this

24   accurately show what you just described happened on that day,

25   that —

1    A.  No, no.  This was prior to that.  This was after I had

2    closed, I did a walk-through, you know, in my house maybe, you

3    know, a couple days later and had seen this — you know, I think

4    it's called Ram Board up inside.  Now can I elaborate on that,

5    to say what — okay.  I was surprised because the work that was

6    to be done was my deck and my kitchen; this is in my living

7    room.

8    Q.  Okay.  So let me just make sure I have the time line

9    correct.  So this was done prior to the day you described Mr.

10   Kennedy and his worker —

11   A.  Correct.

12   Q.  — into your house?  So do you have a — do you recollect when

13   this was done?

14   A.  It was probably, I would say, right after the closing,

15   because, you know, I gave him the first check on March 26th, so

16   I believe I probably gave him the key to my house at that point

17   — oh, I couldn't have had the key.  I'm sorry.  So after I

18   closed, I gave him a key to the house.

19   Q.  Okay.  And so who was it that put this up?

20   A.  I don't know.

21   Q.  This was done while you were out of the house?

22   A.  Correct.

23   Q.  Okay.  And I'm going to show you another one here, also part

24   of P-4.  What does this show?

25   A.  That shows the, I think, the skylight out of my front door

*Berrian - Direct/Hoffman*                    13

1  also.

2  Q.  Okay.  And was this done in the same —

3  A.  Yes, on the same day, I believe.

4  Q.  And the same question for this document?

5  A.  This is showing my dining room and the sliding glass door

6  out to my deck.

7  Q.  And so — and was this also a picture that you took?

8  A.  Yeah, from the same day.  Um-hum.

9  Q.  And apart from what's depicted in those three pictures that

10  I've shown you, was there any more interior work?

11  A.  No, not at all.

12  Q.  At —

13  A.  No, hum-um.

14  Q.  And I'm just going to show you now what's been marked as

15  Exhibit P-5.  What does this depict?

16  A.  That is the sun room that is under the deck, and that was

17  what eventually was taken apart.

18  Q.  Okay.  So in what you earlier testified, —

19  A.  Um-hum.

20  Q.  — around the end of March, —

21  A.  Beginning of April, yes.

22  Q.  — that Mr. Kennedy and his worker came, was that done on

23  this date or is that — with what's shown in this picture, —

24  A.  That —

25  Q.  — was the result of that work?

1   A.  That is to show the before.

2   Q.  That is the before.

3   A.  That is the before.

4   Q.  Okay.

5   A.  Um-hum.

6   Q.  So let me move on to —

7   A.  And that's the after.

8   Q.  Okay.

9   A.  Part — part of the after.  And that was to show the exposed

10  electrical outlet that was in — you know, exposed to the

11  elements.

12  Q.  Okay.  And this — I'm sorry to interrupt you.

13  A.  Yeah.  No, and also it's to show the Ram Board that was left

14  behind, too.

15  Q.  Okay.  So all of that, what you just described, the

16  difference in these two pictures of your, I guess, your sun

17  room?

18  A.  Yeah.

19  Q.  Between here and here, that's what was done on the

20  exterior —

21  A.  Correct.

22  Q.  — by the worker on that date that —

23  A.  Correct, um-hum.

24  Q.  And then you mentioned that the Ram Board was left behind?

25  A.  Correct.  That's also part of — to show the other exposed

1  electrical outlet.  And that was also that same day after the

2  worker had torn down the sides.

3  Q.  Okay.  Thank you.  All right.  So at that point, after Mr.

4  Kennedy and his worker had come and done the work that we've

5  shown in the pictures, had you — to your knowledge, was — had

6  any materials been ordered for your project?

7  A.  I ordered my cabinets myself and that was through The Home

8  Depot but that was it.  Nothing else.

9  Q.  Okay.  So you weren't told by the Defendant that he or his

10  company had ordered any other material —

11  A.  No, no, we had already discussed that prior — like, that I

12  was ordering the cabinets myself, and he was just going to be

13  installing them.

14  Q.  Okay.  Now going back to this picture of the windows being

15  covered, —

16  A.  Um-hum.

17  Q.  — which I think you said was done one day when you were out

18  of the house, what was your understanding of why the windows had

19  been covered in this way?

20  A.  I don't — I really don't — I — I mean we had discussed

21  permits, but I thought that Mr. Kennedy told me he was not going

22  to be getting permits, like Mr. Laputka said it was in my

23  contract.  I don't remember that, but, yeah, I don't know why

24  those windows were covered.  As I said earlier, because

25  especially this was the living room and the work that was

*Berrian - Direct/Hoffman*                                    16

1  supposed to be was the kitchen and the deck, which were in the

2  back of the house.

3  Q.  Okay.  So what happened after that?

4  A.  So after Terrance came to the house and took apart the sun

5  room, I had a neighbor in the Silk Mill apartments who is a

6  certified New Jersey and Pennsylvania inspector, I had had my

7  home inspected for the sale of the house — you know, that you're

8  supposed to — and this friend just casually mentioned to me —

9           MR. LAPUTKA:  I'm going to object, Your Honor.  This

10  is hearsay without hearing them testify.

11           THE COURT:  If you could refrain from saying what

12  someone else told you, unless it's Mr. Kennedy.

13           THE WITNESS:  Okay.  I'm not sure then.

14  BY MS. HOFFMAN:

15  Q.  Okay, let me rephrase the question.

16  A.  Yeah.  Thanks.

17  Q.  So what was your next — next interaction with Mr. Kennedy

18  after this?

19  A.  Oh, okay.  So after speaking with my friend, that it was — I

20  was advised to —

21           MR. LAPUTKA:  I'm going to object again, Your Honor.

22  It's hearsay what she was advised by her friend.

23           THE WITNESS:  Okay.

24           THE COURT:  So you cannot testify to what someone else

25  told you —

1           THE WITNESS:  Okay.

2           THE COURT:  — unless it's Mr. Kennedy.

3           THE WITNESS:  Okay.

4           THE COURT:  So to the extent that your counsel is

5    asking you what happened next, you can give me what actions you

6    took, —

7           THE WITNESS:  Okay.

8           THE COURT:  — but you can't tell me some advice that

9    you were given.

10          THE WITNESS:  Okay.

11          THE COURT:  Okay?

12          THE WITNESS:  Okay.  I approached Mr. Kennedy in

13   regards to some safety issues around my home that hadn't come up

14   during the regular home inspection.  And so I had already had,

15   you know, this contract that I signed that had the renovations.

16   And so I asked him, I believe it was a telephone conversation, I

17   was concerned for, in particular, I had an older — it was for

18   the name of fuse box.  And I would like that to be changed out.

19   And I was concerned more about the electrical, there were some

20   electrical issues, safety issues for, you know, general.

21          And so I said I'd like to add that or, you know, I

22   think the, quote, change order, I'd like to add that to the

23   contract we already had or the agreement we already had.

24          I do remember Mr. Kennedy objecting.  And I said,

25   well, I understand that this will be an additional expense, so

*Berrian - Direct/Hoffman*                                                18

1   if you could lay out what that expense will be and I will, you

2   know, take a look at that it.  And then that will, you know, be

3   added onto what we already discussed.

4   BY MS. HOFFMAN:

5   Q.  Okay.  So you discussed the change order, but did you ever

6   sign any amendments or additional work other than that what was

7   agreed to in your contract?

8   A.  No, I did not, nor did I offer any more money after that.

9   Q.  Okay.  Well, let me — let me ask you about that because when

10  we showed — when I showed the check — well, let's bring it back

11  up.

12  A.  Um-hum.

13  Q.  I just want to get the timing clear, so —

14  A.  Sure.

15  Q.  — it looks like for the first check, for 25,000, that was

16  March 26th, —

17  A.  Yes.

18  Q.  — correct?

19          And you said somewhere around the end of March or

20  beginning of April is when the worker came to your house and did

21  the cleaning of the —

22  A.  In my —

23  Q.  — sun room and tore down —

24  A.  Yeah.  I'm sorry.  And I would say maybe that is when — you

25  know, maybe it was April 5th, maybe that was, you know, Mark

*Berrian - Direct/Hoffman*                                                    19

1   came to the house with Terrance, so maybe that was when I

2   presented him with that second check, and then Terrance did the

3   demolition.

4   Q.  Okay.  At that time, as of April 5th, before you gave that

5   second check, were you satisfied with the speed of the work that

6   was being done?

7   A.  No.

8   Q.  And why not?

9   A.  Because I was told it would be done, you know, — or started

10  the day after my closing, and I was still in my apartment and

11  was planning to move in once I left my apartment around June

12  1st.

13  Q.  Okay.  So after this April — after you made the second

14  payment on April 5th, which may or may not have been the day

15  that they came back to your house —

16  A.  Right.

17  Q.  — or that they came to your house, did they ever return

18  after that?

19  A.  No.

20  Q.  So no more work other than what was shown here?

21  A.  Correct.

22  Q.  So around April 15th, what, if anything, did you decide to

23  do in regards to this project?

24  A.  I decided to ask if I could terminate our agreement.  I

25  can't say I was advised.  I — I felt that not only was the work

*Berrian - Direct/Hoffman*                                    20

1   not being done but that it would have been too costly to

2   continue, if I were to go with Mr. Kennedy.

3   Q.  Okay.  And are you basing that, when you say it was too

4   costly, are you basing that on the contract or the change order,

5   or something else?

6   A.  The change order that — that, you know, — after the change

7   order, it was brought to my attention that this was extremely

8   costly.

9   Q.  All right.  Let me just pull that up.  So here's a document

10  that was previously marked as P-3 on — I don't know if it's too

11  small for you to read, but do you recognize what this is?

12  A.  Yes.

13  Q.  And what is this?

14  A.  It's a notice from Caitlin, who is obviously his office

15  manager.  I spoke with her a few times in the process.  And so

16  that was her email with attached to the change orders.

17  Q.  And then attached to that it says — is this the change order

18  you mentioned —

19  A.  Yes, yes.

20  Q.  Okay.  And —

21  A.  I believe the total, if you go to the next page, yeah, came

22  out to $68,000 and change, and that was in addition to the

23  80,000 that original — you know, so it would have been 80,- plus

24  the 68,000.

25  Q.  And, just to be clear what this change order covers, I mean

*Berrian - Direct/Hoffman* 21

1    I don't — I'm not going to ask you to go through and read the

2    whole thing, but —

3    A.   Right.  These were more of the — as I said, safety issues

4    that were brought to my attention that I, you know, felt were

5    important.  I was, you know, living in the home with my

6    daughter.  And, you know, I felt that it would be prudent to try

7    to take care of these things.

8    Q.   So then, as you testified, at that point, as of April 15th

9    or so, you were unhappy with various things that you already

10   mentioned, —

11   A.   Um-hum.

12   Q.   — and so what did you do, what actions did you take at that

13   point?

14   A.   I sent Mr. Kennedy an email asking him to terminate our

15   contract or informing him that I would like to terminate our

16   contract and that I also requested the remainder of my deposit

17   and my key.

18   Q.   Okay.  So this is a document that was previously marked as

19   P-6.  And is — is this what you're describing?

20   A.   Right, yeah.  That is a — you know, it says there I offered

21   to pay $2500 for the removal of the sun room and the clean out

22   of the garage, and — but I wanted the remainder of that money.

23   Q.   Okay.  And did you receive any response?

24   A.   I received two responses.  The first one that I believe it

25   was, you know, was an email, the cover of the email stated that

*Berrian - Direct/Hoffman*                                            22

1   Mr. Kennedy was agreeing to return my money and I believe in

2   full and said he would return the key.  But attached to that

3   email was a document where he said that his lawyer was advising

4   him not to return my money and that he was entitled to at least

5   I believe it was $29,000 of the money and he — I don't remember

6   what he said about the key in that.

7   Q.  Okay.  So this is — this was previously marked P-7.  And

8   then is that too small or can you see that?

9   A.  I can see it — oh, it's a little blurry.

10  Q.  Yeah, I don't — okay.  So what — so what is this?

11  A.  That's exactly what I'm saying.  That is the cover of the

12  email where he said, you know, if I do what you'd like to do, I

13  can return your key and balance to you as early as tomorrow.  So

14  that gave me hope that I was going to get the remainder of my

15  money and that he was agreeing to the $2500 payment for the

16  clean out of the sun room.

17       MS. HOFFMAN:  Okay.  And I believe that there was a

18  proposed exhibit of Defendant — the Defendant had introduced.

19  So I just want to pull that up.

20       Do you remember what it was marked as, the other

21  conversation she mentioned?

22       MR. LAPUTKA:  I believe it was — Exhibit Defendant's

23  D.

24  BY MS. HOFFMAN:

25  Q.  So I guess this document would be marked as Defendant's D, —

1   A.   Um-hum.

2   Q.   — is this the attachment that you were —

3   A.   Yes.

4   Q.   — describing?

5   A.   Um-hum.  And I'd like to just point out he said:  I wish we

6   could have spoken before you made the decision to interview

7   other contractors.  I did not interview other contractors at

8   that time.

9   Q.   Okay.  And speaking of that, though, you mentioned, you're

10  pointing out he said that I wish we could have spoken, —

11  A.   Um-hum.

12  Q.   — I mean when you sent him your email saying I want to

13  cancel this contract, —

14  A.   Um-hum.

15  Q.   — how many, I mean if you can estimate, how many times had

16  you spoken with him or expressed your dissatisfaction before

17  terminating the contract?

18  A.   Maybe — I don't remember if it was — you know, it's

19  obviously not in writing, so it may have been a phone call and

20  probably meeting once or twice, I don't remember.

21  Q.   Um-hum.  But what was his response to those conversations

22  when you said I'm not happy?

23  A.   I — if I — if I — you know, I don't remember exactly, but

24  if, you know, he did respond, he probably was saying that, you

25  know, well, I will get you on the schedule, I will get you on

*Berrian - Direct/Hoffman*                                                    24

1    the schedule.

2    Q.  Okay.

3    A.  But if I — can I elaborate again?

4    Q.  Of course.

5    A.  I do remember, though, that when I received those change

6    orders, by the time I received the change orders, I was — and

7    saw the additional 68,000 and change, I probably only took a day

8    or two to decide that that — I wasn't going to go forward.

9    Q.  All right.  So apart from the lawsuit that we're here on

10   today, as a result of this issue, did you take any other legal

11   action, file any other lawsuit?

12   A.  Not lawsuits.  I did approach the Attorney General's office.

13   Am I allowed to speak about that?

14   Q.  You are, but I just want to clarify.  So, —

15   A.  Okay.

16   Q.  — for instance, in the Court of Common Pleas, did you bring

17   any lawsuit against him there in the North Hampton County Court?

18   A.  I did file a police report, but, no, I don't know if I'm

19   answering that correctly, right.

20   Q.  I mean it's okay, it's okay.  I know this was all a long

21   time ago.  Okay.

22   A.  Yeah.

23        MS. HOFFMAN:  So let me just pull something out here.

24   Okay.  So this was — and, I mean, this was submitted as a

25   rebuttal exhibit, so I don't know what the Court would prefer to

*Berrian - Direct/Hoffman*                                    25

1   do in terms of introducing.  I believe according to the Court

2   procedure, it was to be share —

3          MR. LAPUTKA:  Your Honor, I'm going to object.  Any

4   exhibit that I haven't yet seen —

5          THE COURT:  That you haven't seen yet.

6          MR. LAPUTKA:  — but I will certainly concede that a

7   lawsuit was filed against my client in North Hampton County, if

8   that's where this is going.  I mean it's a matter of public

9   record.

10          THE COURT:  Is that —

11          MS. HOFFMAN:  That's fine.

12          THE COURT:  That will work?

13          MS. HOFFMAN:  Yeah.  That — that —

14          THE COURT:  Okay.

15          MS. HOFFMAN:  — obviates the need for a lot of —

16          THE COURT:  Okay.  Okay.

17          MS. HOFFMAN:  Thank you.

18          MR. LAPUTKA:  Sure.

19          MS. HOFFMAN:  Okay.

20   BY MS. HOFFMAN:

21   Q.  So — so, Ms. Berrian, and if I — would it refresh your

22   memory if we, as the defense just stipulated, that there was a

23   lawsuit filed by you in the North Hampton County Court of Common

24   Pleas against Mr. — Mr. Kennedy and DSK?

25   A.  There was an attempt, but I don't know if there was an

*Berrian - Direct/Hoffman*                                        26

1   actual — like this is the first time I've been in a courtroom

2   for this, so I don't know if that's in reference to the magis- —

3   going to the magistrate and then the district attorney.  I had

4   discussions with the district attorney over the phone and then

5   through the police, but whether or not there were actually any

6   papers filed, I'm not sure.

7   Q.  Okay, that's fine.

8   A.  I'm sorry, I'm not sure how I'm understanding.

9   Q.  That's okay.  So as — as it is a matter of public record, if

10  I represented to you that at arbitration in that matter, you

11  were awarded a default judgment in the amount of $50,000 against

12  DSK; does that refresh your memory?

13  A.  Oh, when you and I — oh, I'm sorry.  I thought that was part

14  of this.  So, yes, I do remember that.  Okay, I know where

15  you're going.

16  Q.  No.  I understand why you would think it was the same

17  matter.

18  A.  Okay.

19  Q.  But — okay.

20  A.  Yeah.

21  Q.  And is it your understanding — what is your understanding

22  about the claims against Mark Kennedy personally in that

23  lawsuit?  Are those being allowed to proceed?

24  A.  The ones that I made personally, no, nothing is being

25  allowed to proceed.

*Berrian - Direct/Hoffman*                                          27

1   Q.  Okay.  And have you received any money in compliance with

2   that judgment against DSK?

3   A.  No.

4   Q.  Okay.  Did Mr. Kennedy ever inform you that DSK was in the

5   process of closing down or dissolving?

6   A.  So prior to his deposition, no, I did not know that.

7         MS. HOFFMAN:  All right.  And I do just one more

8   thing, want to bring up a copy of your contract.

9      (Counsel confer.)

10         MR. LAPUTKA:  And let me just give you one minute in

11   the draw order.

12         MS. HOFFMAN:  Sure.  Is that a claim?

13         THE COURT:  Are they in Exhibit A?

14         MS. HOFFMAN:  Yes.  I apologize.

15   BY MS. HOFFMAN:

16   Q.  So, Ms. Berrian, I'm going to show you the last exhibit

17   that's been previously marked as Defendant's Exhibit A.  Do you

18   recognize what is this?

19   A.  Um-hum.

20   Q.  And what is it?

21   A.  That is the original contract or renovation agreement,

22   um-hum.

23   Q.  And if I turn to the second page, so you see here on the

24   first page under kitchen, —

25   A.  Um-hum.

*Berrian - Direct/Hoffman*                                    28

1   Q.  — I'm just pointing out where can you read this part that's

2   in parentheses?

3   A.  Excludes architectural drawings or engineering permit and

4   inspection costs.

5   Q.  Okay.  And I'm just going to go through and point out is it

6   — is it repeated —

7   A.  Yes.

8   Q.  — at various points —

9   A.  Yes.

10  Q.  — throughout?  Okay.

11          And I'm just looking quickly, but you could also look.

12  Other than those parentheticals, I'm not seeing anywhere else

13  that permits are mentioned; is that — that —

14  A.  That is correct, —

15  Q.  — correct?

16  A.  — yes.

17  Q.  Just hang on one second.  Okay.  And then here on the last

18  page, obviously is that — is that your signature?

19  A.  That is my signature.  And, yes, I see I am the only person

20  who signed it, yes.

21          MS. HOFFMAN:  All right.  Those are all the questions

22  I have for Ms. Berrian.

23          THE COURT:  Okay, Mr. Laputka, cross?

24          MR. LAPUTKA:  Just one second, please, Your Honor.

25          MS. HOFFMAN:  Thank you.

*Berrian - Cross/Laputka*                                                    29

1        (Counsel confer.)

2                          <u>CROSS-EXAMINATION</u>

3    BY MR. LAPUTKA:

4    Q.   Good morning, Ms. Berrian.   I heard you state before that

5    you were referred to DSK —

6    A.   Um-hum.

7    Q.   — Property Services, LLC by some friend; is that correct?

8    A.   Correct.

9    Q.   Why did your friends refer you to DSK Property Services,

10   LLC?

11   A.   Why did they?

12   Q.   Yes.

13   A.   Well, Michael Miller was my real estate agent.   We were both

14   first in our homes at the same time.   He and his husband were

15   renovating their home as well.   And they knew that I wanted to

16   do some renovations.   They had already interviewed a few

17   contractors prior to me.   They had also moved into their home

18   prior to me.   And they suggested I speak with him.   He was

19   referred to them by Mr. Kennedy's wife Jennifer, who was our — I

20   don't remember her ti- — property manager, I believe, or office

21   manager at the apartment building where we had both lived and

22   where we — where we had lived and where we met.

23   Q.   And did those folks have their project completed by DSK

24   before you hired DSK?

25   A.   No.   They were in the process.   He was working on their

1    house first.

2    Q.  How long would you say he had worked on their house before

3    they referred DSK to you?

4    A.  Maybe a couple of weeks, about a week.  I do remember a text

5    between Michael and I, where he — they were doing the demo work.

6    That was at the end of March.

7    Q.  So towards the end of March, around the same time that you

8    reached out to DSK, you received a text from Michael that DSK

9    had been doing the demo work?

10   A.  Or that they were starting — yes, that —

11   Q.  Was it ever mentioned to you that Mark Kennedy was

12   physically doing the demo work at their house?

13   A.  He or his staff and — yeah, I'm not sure, you know.

14   Q.  And did they ever represent any displeasure with the DSK

15   Property Services, LLC work that was being done at their house?

16   A.  After some months, yes.

17   Q.  After how many months?

18   A.  I would say after I terminated my contract with Mr. Kennedy,

19   yes.

20   Q.  Okay.  So they were pleased with Mr. Kennedy at the time —

21   well, let's back out of it a second.

22   A.  Yeah.

23   Q.  They didn't — Mr. Kennedy didn't work for them; they had DSK

24   Property Services, LLC, correct?

25   A.  Okay.  Yes.

*Berrian - Cross/Laputka*                                              31

1    Q.   And they were pre- — they were pleased with the work that

2    DSK Property Services, LLC was doing at the time they referred

3    this company to you?

4    A.   They were pleased with the demolition as it was going for

5    them.

6    Q.   Okay.  And they didn't represent to you any displeasure with

7    any of the DSK work until after you had terminated your contract

8    with Mr. Kennedy?

9    A.   I think that's correct, the time line.

10   Q.   Okay.  Now you said that closing — actually I don't know if

11   you said.  What was the date of closing on your house?

12   A.   I believe it was March 22nd.

13   Q.   Okay.

14   A.   21st or 22nd.

15   Q.   And you were shown a check earlier for — dated March 26th

16   for $26,000, the $25,000 on the —

17   A.   Twenty-five thousand dollars —

18   Q.   — 26th —

19   A.   March 26, correct.

20   Q.   If you would just bear with me, please, and —

21   A.   Sure.

22   Q.   — be a little patient when I ask questions so you don't talk

23   over with me, because everything is being transcribed and if we

24   talk over each other, it's —

25   A.   They won't hear —

*Berrian - Cross/Laputka*                                    32

1  Q.  — messy and harder to read for Court staff.  Thank you.

2  A.  Got it.  I will try.

3  Q.  So closing was on March 26th of 2021.  And was that the same

4  day that you signed a contract with DSK Property Services, LLC?

5  A.  I believe that's what it says on the contract.

6          THE COURT:  I thought that your testimony was the

7  closing was the 22nd; —

8          THE WITNESS:  Yeah.

9          THE COURT:  — is that incorrect?

10         THE WITNESS:  No.  Closing, I believe, I —

11         THE COURT:  Okay.

12         THE WITNESS:  — it was 22nd, and only I signed the

13  contract —

14         THE COURT:  Because I just wanted to make sure I

15  wasn't missing the wrong date —

16         THE WITNESS:  Yeah.

17         THE COURT:  — because the 22nd is when the closing —

18         MR. LAPUTKA:  Me too, Your Honor.  I wasn't trying to

19  trip anyone up.

20         THE COURT:  No, no, right.

21         THE WITNESS:  I think it was, —

22         THE COURT:  Okay.

23         THE WITNESS:  — and then, yes, when we signed the

24  contract like two, three days later.

25         THE COURT:  Got it, okay.

*Berrian - Cross/Laputka*                                    33

1          THE WITNESS:  Yeah.

2   BY MR. LAPUTKA:

3   Q.  And is this a copy of the contract that you signed —

4          THE WITNESS:  I'm sorry.  I just remembered that that

5   would have explained why I gave him a key at that time.

6          THE COURT:  Okay.

7          THE WITNESS:  Sorry.

8   BY MR. LAPUTKA:

9   Q.  Is this a copy of the contract that you signed?

10  A.  Yes, I believe.  If I'm the only person that signed it, yes,

11  that is the — the copy.

12         MR. LAPUTKA:  Your Honor, if I may, I will put it on

13  the screen, but may I also hand her a copy?  I think it would be

14  easier instead of just showing like this much at a time?

15         THE COURT:  Yeah, that's fine.

16         MR. LAPUTKA:  Okay.

17         THE COURT:  That's fine.

18         MR. LAPUTKA:  Thank you.

19  BY MR. LAPUTKA:

20  Q.  It's just hard showing you one paragraph at a time.  I want

21  to make sure that you take a look at that, —

22  A.  Yeah.

23  Q.  — please, and let me know that that is, in fact, the

24  contract you signed and that that is your signature and date on

25  page 3, March 26, 2021?

*Berrian - Cross/Laputka*                                        34

1   A.  Correct.

2   Q.  Now you see that paragraph above there, the March 26, 2021?

3   A.  The right of recision, correct.

4   Q.  Yes.  What do you know about the right of recision?

5   A.  What it states there.

6   Q.  Did you — did you read this contract before you signed it?

7   A.  I did.

8   Q.  So you knew you had three days to change your mind, right?

9   A.  That's probably after — after I decided, I probably went

10  back to the contract.  To be honest, I don't know if I...

11  Q.  Okay.  So when —

12  A.  ...remember it, we'll say.

13  Q.  Who was the first person that you met with at DSK Property

14  Services, LLC?

15  A.  Mark Kennedy.

16  Q.  And where did you meet with him?

17  A.  On my lawn outside my home.

18  Q.  Did he have a shirt on that said DSK Property Services, LLC?

19  A.  I don't remember.

20  Q.  Did he have a company truck?

21  A.  No, I don't believe so.

22  Q.  No sticker —

23  A.  I think he — I'm sorry.  Might — a pickup truck, but I don't

24  know if it had lettering on it.

25  Q.  Okay.

*Berrian - Cross/Laputka*                                                      35

1   A.   Yeah.

2   Q.   And when you met with him on your lawn, what did you discuss

3   before you came to the terms of this contract?

4   A.   We had discussed, you know, what I was looking forward to do

5   and that I was hoping, you know, we could have these renovations

6   taken care of.

7   Q.   And let's take a look at what you were looking to do here.

8   So there's —

9   A.   Um-hum.

10  Q.   — a couple of different things.

11  A.   Um-hum.

12  Q.   The first one we have here is foyer entryway.

13  A.   Um-hum.

14  Q.   There was a closet that you wanted removed and there was a

15  pony wall and a new closet installed.  Can you tell us a little

16  bit about that, what you were requesting there?

17  A.   As you walk into my home, there is a small closet and to the

18  left of it is a small pony wall.  And I was — my — in my

19  daughter's bedroom, there is a very small clothing closet for

20  her.  And we discussed the possibility of incorporating that

21  front hall closet into her closet to make it bigger, to make it

22  larger.

23  Q.   So that picture you showed us earlier of the side light with

24  the Ram Board over it, —

25  A.   Um-hum.

1   Q.  — is that the foyer?

2   A.  That's — yeah.  That's — so that is when you're coming

3   through the door, the closet, that would be behind it, —

4   Q.  Okay.

5   A.  — facing out to the — to the room.

6   Q.  How about that big window that was covered in Ram Board, is

7   that kind of right by the pony wall on the front door there?

8   A.  Not really, no.

9   Q.  How far away would you say it is?

10  A.  That's a couple of feet, I would say at least three feet

11  away.

12  Q.  Okay.  And there —

13  A.  Sorry.  That is the — that is the bay window that was down

14  onto the Street.

15  Q.  Next to your front door?

16  A.  Yes, somewhat next to that, —

17  Q.  Okay.

18  A.  Um-hum.

19  Q.  And was there demo work done or scheduled to be done

20  pursuant to this contract to that area in the foyer?

21  A.  No.

22  Q.  Well, how would he remove a closet next to the front door

23  and make a match pony wall, install a new closet, a new foyer in

24  the front door without doing work in the foyer?

25          MS. HOFFMAN:  Objection.

*Berrian - Cross/Laputka*                                      37

1        THE WITNESS:  Yeah.  I'm not sure because it wasn't —

2        THE COURT:  What exactly is the objection?

3        MS. HOFFMAN:  Speculation.

4        THE COURT:  Okay.  Mr. Laputka, do you want to just

5   ask it a different way, perhaps?

6        MR. LAPUTKA:  Sure.

7   BY MR. LAPUTKA:

8   Q.  The confusing part to me, Ms. Berrian, is that you told the

9   Court that you had no idea why there was Ram Board put over the

10  windows, —

11  A.  Um-hum.

12  Q.  — but the contract says there was construction that was

13  supposed to occur right there; is that correct?

14  A.  Yeah.  It was wood for the — that — the window on the door,

15  the skylight on the door, correct.  But there wasn't going to be

16  any construction on that larger window.  And that would not have

17  been — it wasn't close enough to have been impacted, —

18  Q.  Okay.

19  A.  — yeah.

20  Q.  So in your opinion tearing down that wall between the foyer

21  and the window couldn't possibly have broken one of those

22  windows —

23  A.  No.

24  Q.  — in the front?  Okay, fair enough.

25        But there was Ram Board placed on those, presumably to

*Berrian - Cross/Laputka*                                    38

1  protect them?

2  A.  Presumably.

3  Q.  Now we go to the kitchen.

4  A.  Yes.

5  Q.  In the kitchen, there was demo that needed to be done; is

6  that correct?

7  A.  Demo needed to be done, correct.

8  Q.  What demo needed to be done in the kitchen besides take down

9  the cabinets?

10 A.  There was a ceiling, like a false ceiling, that that needed

11 to be — it was dropped, so that was going to be removed and the

12 countertops were going to be taken out.  You know, that type of

13 thing.

14 Q.  Okay.  And was there any demolition done in the kitchen at

15 all?

16 A.  No.

17 Q.  There wasn't an island that was removed?

18 A.  No.

19 Q.  There was no work done in the kitchen?

20 A.  No, not at all.

21 Q.  Okay.

22 A.  Not — not by Mr. Kennedy.

23 Q.  And this is — this is a $26,600 kitchen remodel that does

24 not include cabinets, right?

25 A.  Correct.

*Berrian - Cross/Laputka* 39

1  Q.  Or countertops,?

2  A.  Correct.

3  Q.  Okay.

4  A.  I paid for those myself.

5  Q.  Gotcha.  And you see down here where it says:  Excludes

6  drawings, engineering, permit, and inspection.  Right?

7  A.  Correct.

8  Q.  So you knew that there was not going to be a permit pulled

9  by the contractor, that was your requirement?

10         MS. HOFFMAN:  Objection.

11         THE WITNESS:  Yeah.

12         THE COURT:  I'm going to sustain that objection.  I'm

13  not sure that that is the conclusion we can —

14         MR. LAPUTKA:  Okay.

15         THE COURT:  — draw, so why don't you trying asking

16  differently.

17  BY MR. LAPUTKA:

18  Q.  Why would you think that DSK Property Services, LLC was

19  going to get permits for this job if it specifically states in

20  the contract that there's — excludes the permit?

21         MS. HOFFMAN:  Objection.

22         THE WITNESS:  There was...  I'm willing to answer

23  that.

24         THE COURT:  I — I understand that you're willing to

25  answer that.

*Berrian - Cross/Laputka*                                    40

1        What I'm going to say is why don't you ask her what

2   she understands that phrase to mean.  I think that's the only

3   way that the only way that we could past this.

4   BY MR. LAPUTKA:

5   Q.  Okay.  Ms. Berrian, what do you understand this phrase here

6   to mean that is separated from the paragraph above in

7   parentheses?

8   A.  I believe it's — I understand it to mean that we were not

9   going to apply for permits because that was what I was told by

10  Mr. Kennedy.

11  Q.  Okay.

12  A.  In a telephone conversation or when — maybe when we first

13  met, but I know it was — that was conveyed to me.

14  Q.  Now you said that we were not going to apply.  Do you mean

15  that —

16  A.  Well, sorry.

17  Q.  Do you mean that you were not going to apply or he was not

18  going to apply?

19  A.  That I — going back to 2021, if I recall correctly, I

20  believe he said we do not need permits for this.

21  Q.  Next we're doing a deck renovation and extension for about

22  $12,000; is that correct?

23  A.  Um-hum.

24  Q.  Was anything done on the deck?

25  A.  No.

*Berrian - Cross/Laputka* 41

1  Q.  The tread boards of the deck were not removed by —

2  A.  No.

3  Q.  — Mr. Kennedy or DSK?

4  A.  No.

5  Q.  Next we have HVAC, a $23,000 upgrade, correct?

6  A.  Correct.

7  Q.  And then the basement garage for 12,700, —

8  A.  Correct.

9  Q.  — you did testify that there was a bunch of garbage that was

10 in the garage that was cleaned out by DSK?

11 A.  Yes.  It says the — well, it's not on this list, but there

12 was, for example, pegboard that was removed.  As far as I

13 remember, the glass was not removed, and my daughter ended up

14 removing it herself.

15 Q.  Is there anywhere on this list where it says that DSK was to

16 remove the garbage from your garage?

17 A.  Well, if it's — I recall that firewall can be removed, in

18 place — no, I don't think that — yeah.  And if it was considered

19 garbage, then I thought it was being prepped for this work.  So

20 that's how I understood it.

21 Q.  Okay.  Then I see here basement, a demo room under deck; is

22 that the room that you showed us pictures of earlier?

23 A.  Yes.  Yes.

24 Q.  So that was, you know, like an enclosure under your deck

25 that was —

1    A.   Correct.

2    Q.   — completely removed by DSK; is that correct?

3    A.   Not completely, but, yes, it was removed.

4    Q.   Okay.  The pictures to me look like there were no walls or

5    anything left; what was still there?

6    A.   The two electrical boxes that were exposed to the elements.

7    Q.   Okay.

8    A.   Yeah.

9    Q.   On the first day of work, —

10   A.   Correct.

11   Q.   — when they stopped at the end of the day.

12   A.   Right.

13   Q.   Okay.

14   A.   Yeah.

15   Q.   But all the walls were removed?

16   A.   Yes, I believe.

17   Q.   Okay.  Now you started out your testimony this morning by

18   saying that DSK employees only showed up one day?

19   A.   Correct.

20   Q.   But then earlier than — you know, then you later said there

21   was work done on the house before you were there, —

22   A.   Meaning —

23   Q.   — like the Ram Board was put up before you —

24   A.   Correct.  Correct.

25   Q.   — there was prep work done that was done when you were not

*Berrian - Cross/Laputka*                                            43

1   there?

2   A.   Correct.

3   Q.   How often we're you not at this house?

4   A.   After I closed, I was probably there a few times, a few

5   times.

6   Q.   Was it every day?

7   A.   No.

8   Q.   Was it two days a week?

9   A.   No.  No.

10  Q.   Is it possible that DSK and their employees were there doing

11  things on other days that you just didn't realize?

12         MS. HOFFMAN:  Objection.

13         THE COURT:  What's the objection?

14         MS. HOFFMAN:  Speculation.

15         THE COURT:  I'm going to allow that question.

16         Go ahead, you can answer that.

17         THE WITNESS:  Okay.  Is it possible?  Can I say I

18  highly doubt it, meaning because I was either there, you know,

19  or had — yes, I will just say how we got at this, —

20  BY MR. LAPUTKA:

21  Q.   How would you know —

22  A.   — I don't know.

23  Q.   — if they came out and did the review of the HVAC, inspect

24  the size of the system if you weren't home?

25  A.   Because I knew that they were busy on my friend's house and

*Berrian - Cross/Laputka*                                                44

1   they were working there.  So I would say I was more in touch

2   with my na- — friends and what was going on at their house than,

3   you know, —

4   Q.  So you knew that there was a project going on at your

5   friend's house.

6   A.  Yes.

7   Q.  But you expected them to drop that project and come do yours

8   right away?

9   A.  Not at all, —

10              MS. HOFFMAN:  Objection.

11              THE WITNESS:  Not at all.  I never stated at that.

12  BY MR. LAPUTKA:

13  Q.  Let's take a look down here at the terms of this project.

14  What's the start date of this project?

15  A.  Commencing spring of 2021.

16  Q.  And when did it start?

17  A.  In the spring.

18  Q.  Okay.  And when does it say it would be completed?

19  A.  By fall.

20  Q.  Well, if it was going to be completed by the fall of 2021,

21  why do you think it was reasonable for you to expect to move in

22  in June?

23  A.  That is a good question and I'd like to say that I think

24  that if that was unreasonable of me to expect that, then I

25  should have been informed that it was unreasonable of me to

*Berrian - Cross/Laputka*                                       45

1    expect that, but I was not.  I was never given the opportunity

2    to discuss that further with Mr. Kennedy.

3    Q.  But you were given a contract that you signed that said fall

4    of '21?

5    A.  Right.

6    Q.  Okay.  Now —

7    A.  And it was a contract that only I signed, correct.

8    Q.  Okay.  I don't know what the relevance of that is.  Would

9    you like to expand upon that?

10   A.  Well, I understand that under the HIPAK (phonetic) that, you

11   know, both — both parties have to sign a contract in order for

12   it to be valid.

13   Q.  Oh, okay.  I respect that that's your understanding and I

14   will respectfully disagree with it.

15          Now you had an inspection done prior to purchasing

16   this house by Allied Inspection; is that correct?

17   A.  I believe so, yes.

18   Q.  And did that inspection reveal all of these other issues

19   that you say were safety concerns?

20   A.  You mean according to the change orders?

21   Q.  I'm — yes, according to the change orders.

22   A.  Okay.  Where they revealed by Allied, no, they were not

23   revealed by Allied.

24   Q.  Okay.  So you do agree that your change orders were very

25   extensive, correct?

*Berrian - Cross/Laputka*                                      46

1    A.  Yes.  Extensive, yes.  Thank you.

2    Q.  And the email, in fact, that you sent to my client on April

3    16th was after he had begun working on the homes; is that

4    correct?

5    A.  If that's — yes.  Yes.  That seems realistic, timely.

6    Q.  And this is about 20 or 21 days from the date that you

7    signed the contract and my client began the work; is that

8    correct?

9    A.  Um-hum.

10   Q.  So 21 days into a project, after careful consideration, you

11   decided to go in a different direction and will no longer need

12   his services?

13   A.  Um-hum.

14   Q.  My question to you is:  What made you think that you had

15   that right under the contract?

16   A.  I'm a consumer and I just felt like, you know, if someone's

17   not fulfilling their obligation, that you have a right to

18   proceed and that's —

19   Q.  Well, let me ask you, —

20   A.  Um-hum.

21   Q.  — what obligation was not fulfilled?

22   A.  Any of these — you know, nothing that was stated in the

23   contract.

24   Q.  Well, but the contract —

25   A.  Other than that —

*Berrian - Cross/Laputka*                                              47

1   Q.  — stated that that stuff was going to be done by the fall of

2   2021.  And, in fact, you did state a few things were done within

3   the first 20 days.

4   A.  The con- — it was supposed to be completed by the fall of

5   2021, correct.  But the only thing that I see on this contract

6   that was done with the demo room under the deck — the demolition

7   of the room under the deck.

8   Q.  Why would you think that you had the right to terminate the

9   contract for going in a different direction?  Because your email

10  doesn't say that you're terminating a contract for — let me —

11  let me scratch that question and start over.

12          Your email does not state that you were terminating

13  the contract due to any failure of my client.  It states that

14  you were terminating the contract because you were going in a

15  different direction.  Is that correct?

16  A.  Yeah.

17  Q.  What makes you think that you have the right to terminate a

18  contract to go in a different direction on a whim and get all

19  your money back?

20  A.  Because I am a consumer and I was given advice to —

21  Q.  All right.

22  A.  — to approach it that way.  Am I allowed to say that?

23  Q.  Now let me ask you.  You had filed an adversary action in

24  this bankruptcy against my client alleging fraud.

25  A.  Um-hum.

*Berrian - Cross/Laputka*                                                48

1   Q.   Do you know what fraud is?

2   A.   I do.

3   Q.   What part of anything that DSK Properties did to you was

4   fraudulent?

5   A.   I believe that what can be considered fraud is the fact that

6   other than coming to my house for, you know, one day in that

7   timeframe and removing, you know, the room, there was no other

8   real work done, I guess.  And, you know, when Mark said that he

9   would give me back my money, I believed that that was going to

10  happen as well.

11  Q.   Well, did Mark say he would give you back all of your money

12  or did he say he would give you back the balance?

13  A.   I'd have to go back to that email that he wrote.

14  Q.   Let's go back to it.

15  A.   No, before that.  The other piece.

16          MR. LAPUTKA:  This blue one?  One of your exhibits.

17          Do you have the one she's referring to?  She said it

18  was the shorter email.

19  BY MR. LAPUTKA:

20  Q.   Is this the email you're referring to?

21  A.   Yes.

22  Q.   And this says from you:  Please see the attached and — oh,

23  this is —

24  A.   No.

25  Q.   — please see the attached and advise me on what you do.  I

*Berrian - Cross/Laputka*                                    49

1   can return the key and the balance to you as early as tomorrow;

2   is —

3   A.   Correct.

4   Q.   — that correct?

5   A.   Correct.

6   Q.   Is this what was attached?

7   A.   Yes.

8   Q.   Okay.  Now this says all of the details, right?

9   A.   Yes.

10  Q.   And right down here, it says what he's proposing to give you

11  back as the balance due was 1500 bucks, correct?

12  A.   As of — yes, he's saying that's what the difference is.

13  Q.   With a full explanation of your breach of contract and why

14  he's keeping all of the money that you had paid him so far; —

15  A.   Um-hum.

16  Q.   — is that correct?

17  A.   Yes.

18  Q.   Okay.  And then he offered you other solutions —

19  A.   Um-hum.

20  Q.   — by saying:  Hey, these are things that we can still do for

21  this money, if you like, —

22  A.   Um-hum.

23  Q.   — right?  I can still complete the deck renovation and

24  extension, I can still do these things in your garage if you

25  want, and I can still do these things on the exterior?

*Berrian - Cross/Laputka*                                                50

1    A.   Um-hum.

2    Q.   And all you had to do was respond to this and say what you

3    wanted; is that correct?

4    A.   I believe.

5    Q.   Did you respond to it?

6    A.   No, I did not.

7    Q.   What did you —

8    A.   I was told —

9    Q.   — do instead?

10   A.   I was told to contract the attorney general.

11   Q.   Okay.  And did the attorney general make a claim against DSK

12   Contracting on your behalf?

13   A.   I don't know if he made a claim.  I was — I, you know, went

14   on their website and I wrote out my side of the story,

15   complaint, however you want to put it.  And then they sent to

16   me, they got back to me and said we will — we received it and we

17   will let you know what the next steps are.

18              Do you want me to continue?

19   Q.   Sure.

20   A.   And then I received a copy of Mr. Kennedy's rebuttal to

21   that.

22   Q.   And then what happened with respect to the Attorney General

23   complaint that you filed?

24   A.   The Attorney General said that we could mediate but that

25   they did not think there was enough evidence to go forward, I

*Berrian - Cross/Laputka*                                        51

1   believe, if that's correct, if I'm using the right terminology.

2   Q.  And what was your — did they give you any other explanation

3   or understanding of what they would need to go forward?

4   A.  No.

5   Q.  Okay.

6   A.  But I believe the attorney — whoever I spoke with in the

7   Attorney General's office said I should seek a lawyer.

8   Q.  Okay.

9   A.  A lawyer.

10  Q.  Now so far this morning, as far as you and I are concerned,

11  we've been talking about DSK Property Services, LLC; is that

12  correct?

13  A.  Correct.

14  Q.  And your contract is with DSK Property Services, LLC?

15  A.  Correct.

16  Q.  It's got the home improvement contractor number on there,

17  the address, the phone number, all the information required by

18  the Home Improvement Contractor Act, correct?

19  A.  Correct.

20  Q.  The correspondence that you received from Mr. Kennedy's

21  email was labeled DSK Property, LLC; is that correct?

22  A.  Correct.

23  Q.  And this letter from his office on letterhead, DSK Property

24  Services, LLC, correct?

25  A.  Correct.  Surprisingly that wasn't on the contract, though.

*Berrian - Cross/Laputka*                                      52

1  Q.  Well, it is right here.

2  A.  Oh, I'm sorry.  Because it's stated, not that — I'm sorry —

3  looking at the letterhead.

4  Q.  Okay.  And, in fact, even his Home Improvement Contractor

5  license is even on his letterhead, right?

6  A.  Yes.

7  Q.  So there is no doubt in your mind that you were dealing with

8  the company DSK Properties, LLC; is that correct?

9  A.  Correct.

10  Q.  Well, why do you think Mr. Kennedy owes you this money

11  personally?

12  A.  Because the way I understand it, he closed his business and,

13  you know, when the person's business is closed, I don't know

14  what the route is to get your re- — you know, retribution,

15  remuneration, or refund.  I am — I've never done this before, so

16  I'm going by the advice of, you know, others, because I never

17  wanted to be in this spot, to begin with.

18  Q.  I understand.

19  A.  Um-hum.

20  Q.  But you had no contract with Mr. Kennedy personally?

21  A.  No contract with Mr. Kennedy pers- —

22  Q.  No dealings with him personally?

23  A.  When you say no dealings, I didn't deal with him.  You know,

24  he came to my house.  He dropped off Terrance the day of, you

25  know, the clean up and —

*Berrian - Redirect/Hoffman*                                            53

1    Q.   On behalf of the company, though.

2    A.   Oh, okay.

3    Q.   He didn't come over to hang out and have coffee?

4    A.   Correct.

5    Q.   Okay.  Never went out to dinner with him?

6    A.   No.

7    Q.   Never —

8    A.   Or his wife, no.

9             MR. LAPUTKA:  Okay.  No further questions, Your Honor.

10            THE COURT:  Redirect?

11            MS. HOFFMAN:  Briefly.

12            MR. CASEY:  Um-hum.

13                        REDIRECT EXAMINATION

14   BY MS. HOFFMAN:

15   Q.   Ms. Berrian, I'm just going to draw your attention again to

16   this second page of the contract, which I think you might still

17   have in front of you, right?  So here in the last paragraph

18   where it says work will commence in 2021, and should be

19   completed by fall of 2021.  What is the part that's underlined

20   say, if anything?

21   A.   If all work is released in a timely manner.

22            MS. HOFFMAN:  Okay.  That was the only question I

23   have.

24            THE WITNESS:  Thank you.

25            MR. LAPUTKA:  No recross, Your Honor.

*Kennedy - Direct/Hoffman*                                        54

1          THE COURT:  Okay.  All right.  I presume that everyone

2     is done with their —

3          MS. HOFFMAN:  With Ms. Berrian.

4          THE COURT:  Okay.  You can step down.

5          THE WITNESS:  Thank you.

6       (Witness excused.)

7          THE COURT:  All right.  Ms. Hoffman, do you have any

8     other witnesses?

9          MS. HOFFMAN:  I do.  I would like to call Mr. Kennedy.

10         THE COURT:  Okay.  Mr. Kennedy, come on up.

11      (Comments off the record.)

12         <u>MARK LESLIE KENNEDY, DEFENDANT, SWORN/AFFIRMED</u>

13         THE WITNESS:  Yes.

14         THE REPORTER:  State your name and spell your whole

15    name for the record.

16         THE WITNESS:  Mark Kennedy.  M-a-r-k L-e-s-l-i-e

17    K-e-n-n-e-d-y.

18         THE COURT:  Thank you.

19                      <u>DIRECT EXAMINATION</u>

20    BY MS. HOFFMAN:

21    Q.  Good morning, Mr. Kennedy.

22    A.  Good morning.

23    Q.  So I'm going to show you a document here.  So this has

24    previously been marked Defendant's Exhibit C.

25    A.  Yes.

*Kennedy - Direct/Hoffman*                                      55

1   Q.  Are you able to make out what this document is, exhibit?

2   A.  I believe it's payroll.

3   Q.  Okay.  And are you able to see — I mean when you say

4   payroll, do you — do you know what company?

5   A.  No.

6   Q.  Okay.  Do you recognize the name of the individual that's

7   under employee name there at the top?

8   A.  Terrance?  Where?  Employee name.

9   Q.  Employee name.

10  A.  Yeah, Terrance.

11  Q.  All right.  Do you recognize that name?

12  A.  Yes.

13  Q.  Okay.  And who is that?

14  A.  I know Terrance as a skilled laborer through DSK.

15  Q.  All right.  So if I represented to you that your attorney

16  produced this document in discovery as a DSK payroll or paystub

17  for Terrance Myers (phonetic), would that — would you concede

18  that that's correct?

19  A.  Yes.

20  Q.  And so here where it has the hourly rate, you see where I'm

21  pointing?

22  A.  Yes.

23  Q.  What was Terrance's hourly rate?

24  A.  That reads 12.50.

25  Q.  Okay.  Thank you.  And this person, Terrance Myers, he

*Kennedy - Direct/Hoffman*                                    56

1  worked on the project that DSK did for Ms. Berrian; is that

2  correct?

3  A.  Yes, along with others.

4  Q.  But you're saying, yes, that is correct; is that true?

5  A.  Yes, that is correct.

6  Q.  All right.  When Ms. — and you've been here, you've heard

7  the testimony of Ms. Berrian and the questions of your counsel

8  and me regarding the emails that were exchanged in the middle of

9  April with Ms. Berrian's request for a refund of most of her

10 money and your response, did you ever refund her any of her

11 money?

12 A.  The last correspondence I had with her was that she was

13 going to contact her lawyer and then I didn't hear anything.

14 Q.  You did not refund her money, correct?

15 A.  That is correct.

16 Q.  Okay.  And you are aware that there was a judgment entered

17 against DSK Property Services in the amount of $50,000?

18 A.  Yes.

19 Q.  And did DSK Property Services ever pay that judgment in

20 whole or part?

21 A.  I believe that was a default judgment and the company was

22 out of business.

23 Q.  So the company did not pay that judgment?

24 A.  That's correct.

25 Q.  Okay.  Now I know we've looked at this contract a few times

*Kennedy - Direct/Hoffman* 57

1  already, but I will ask you to say do you recognize what this

2  is?

3  A.  Yes.

4  Q.  And what is it?

5  A.  It is a contract from DSK Property Services to Nancy

6  Berrian.

7  Q.  I'm going to draw your attention to the last page, showing

8  the signature there, and whose signature is that?

9  A.  Nancy Berrian's.

10  Q.  And did you yourself sign this contract?

11  A.  No, I did not.

12  Q.  Did anyone from DSK sign this contract?

13  A.  No, they did not.

14  Q.  Was that your practice as owner of DSK or anyone at DSK not

15  to sign contracts that the company entered into?

16  A.  I — yeah, mo- — I don't think I ever signed a contract.

17  Maybe mostly I signed — no, I apologize.  I mostly never signed

18  the contracts.

19  Q.  And why was that?

20  A.  The contract wasn't with me, it was with DSK.

21  Q.  Right.  But why did no one from DSK sign on behalf of the

22  company?

23  A.  There wasn't any reason to.

24  Q.  When did DSK dissolve?

25  A.  December '23.

*Kennedy - Direct/Hoffman*                                    58

1   Q.  December of 2023?

2   A.  Yes.

3   Q.  Are you familiar with the requirements of the dissolution of

4   an LLC?

5   A.  The requirements that I know of, yes.

6   Q.  Okay.  And what are those?

7   A.  I actually would have to ask, because I had help with them.

8          MR. LAPUTKA:  Your Honor, I'm going to object to this

9   line of questioning.  I don't know how it's relevant that two

10  years later the company was dissolved or, specifically, that

11  it's relevant that my client knows the legal way to dissolve an

12  LLC.

13         MS. HOFFMAN:  Your Honor, it goes to whether he was —

14  what was his intent in the process, in dealing with my client

15  specifically but in general with clients of DSK that he promised

16  to do work for.

17         THE COURT:  I think you can get there, but I think

18  that you need to lay a foundation with respect to that ultimate

19  question.  We haven't heard anything about debts in general of

20  DSK and I think that's where you're going, so I would ask you to

21  lay a foundation before you ask him about what he did or didn't

22  know about what he needed to do.

23         MS. HOFFMAN:  Understood.  Thank you.

24  BY MS. HOFFMAN:

25  Q.  So, to your knowledge, when — at the time that DSK dissolved

*Kennedy - Direct/Hoffman*                    59

1    in December, were there outstanding debts that the company had?

2    A.  Yes, a — yes.

3    Q.  Okay.  Did the debt that Ms. Berrian had with the company,

4    was that included in those?

5    A.  The refund of the $1500 would have been considered.

6    Q.  Okay.  So if I represented to you as a matter of public

7    record that the arbitration award of the default judgment was

8    November 20th, 2023, in which Ms. Berrian was awarded $50,000

9    against DSK, would that not have been considered a debt that the

10   company had at that point?

11          MR. LAPUTKA:  Your Honor, I'm going to object.  That

12   calls for my client's legal conclusion.  He already stated that

13   he thought the debt was 1500 bucks.

14          THE COURT:  I certainly think that she can ask whether

15   he was aware of the arbitration having been entered prior to

16   dissolution, so I'm going to allow that.

17          THE WITNESS:  I apologize.  I don't know what the

18   question —

19          THE COURT:  Why don't you ask the question again.

20   BY MR. LAPUTKA:

21   Q.  Were you — were you aware that there was an award made

22   against — a judgment against DSK of $50,000 on November 20th,

23   2023 in the matter of my client?

24   A.  Yes, but I don't think I knew that until after DSK was

25   closed.

*Kennedy - Direct/Hoffman*                                          60

1   Q.  Okay.  Were you — did you not receive communications from

2   the court on behalf of DSK during that time?

3   A.  The communications would have been through the mail.

4   Q.  Right, but did you receive them?

5   A.  I did.

6   Q.  So you were aware?

7   A.  At some point, yes.

8   Q.  Okay.  So given that there was a judgment that was issued

9   before December of 2023, I don't — I recognize there are delays

10  in — in the mail, but at the time that DSK dissolved, there was

11  a judgment or there was a debt made by — owed to my client,

12  correct, whether or not you were aware of it?

13  A.  Yes.

14  Q.  Okay.  So at the time then in December that DSK did

15  dissolve, did you take the appropriate steps to notify

16  creditors, as you were required to in the dissolution of an LLC?

17          MR. LAPUTKA:  Your Honor, I'm going to object to the

18  question because my client was already asked if he knew what

19  dissolving a corporation entails.  I don't think that he

20  understands any of this and I also don't know how it's relevant

21  whether DSK was dissolved or not.  I would represent to the

22  Court it's not dissolved.

23          THE COURT:  I do think that the question of whether or

24  not — specifically whether notice went out, I think is an

25  appropriate question.  Whether he had knowledge of what he had

*Kennedy - Direct/Hoffman*                                                61

1  to do to dissolve the company, I understand, but I don't think

2  he's being asked that.  I think he's being asked a very direct

3  question about one of the steps, so I'm going to allow you to

4  ask that question.

5  BY MR. LAPUTKA:

6  Q.  So, Mr. Kennedy, were you aware —

7           THE COURT:  Ask it again.

8           MR. LAPUTKA:  Thank you.

9  BY MR. LAPUTKA:

10 Q.  — were you aware that you had an obligation as the sole

11 owner of this LLC to notify creditors that the LLC was being

12 dissolved?

13 A.  No.

14 Q.  Okay.  And you were the sole owner, correct?

15 A.  Yes.

16 Q.  So apart from lawsuits against DSK, have you yourself ever

17 been involved in any lawsuits personally?  Have you ever been

18 sued personally other than this matter?

19 A.  I don't believe so.

20          MS. HOFFMAN:  So again the procedure of introducing

21 rebuttal exhibits, they were previously emailed to the Court.

22 It's my understanding —

23          THE COURT:  Okay.

24          MS. HOFFMAN:  — that they would then be shown to —

25          THE COURT:  Yes.  You can just show them to Mr.

*Kennedy - Direct/Hoffman*                                              62

1   Laputka.

2           MS. HOFFMAN:  Okay.

3           THE COURT:  And we'll take it from there.

4           MS. HOFFMAN:  Okay.  All right.  So this has been

5   previously marked as P-13.

6           MR. LAPUTKA:  When were these submitted to the Court?

7   And what are these rebutting?

8           MS. HOFFMAN:  His statement that he doesn't believe

9   he's ever been sued personally.

10          MR. LAPUTKA:  Your Honor, I just don't see the

11  relevance.  We're here on a 523(a)(2) claim about whether this

12  debt was fraudulently induced.  What does the relevance of a

13  lawsuit from 20 years ago have to —

14          MS. HOFFMAN:  Oh, it's evidence.

15          MR. LAPUTKA:  Oh, it has an 04 case number — oh,

16  sorry, it's a 22 case number.

17          MS. HOFFMAN:  Your Honor, the relevance is that part

18  of the — what we need to prove in this case is intent and it's

19  the state of mind of the Defendant and the credibility of the

20  Defendant specifically in this question is relevant to that

21  issue.

22          THE COURT:  All right.  I'll allow it.

23          MR. LAPUTKA:  But, Your Honor, first we have to prove

24  that my client owes this debt.  They have not even shown

25  anything that would cause my client to have this debt owed

*Kennedy - Direct/Hoffman*                                    63

1    personally.  We're jumping way ahead here.

2              THE COURT:  I do think that it's relevant to

3    credibility.

4              MR. LAPUTKA:  Okay.

5              THE COURT:  So on that basis, I will allow it.

6    BY MS. HOFFMAN:

7    Q.  So, Mr. Kennedy, I will again show what's previously marked

8    as P-13.

9    A.  Oh, I love this.

10   Q.  So you do — do you recognize the document?

11   A.  I recognize this document and I recognize that judge.  And

12   that judge forgot I was even there.

13   Q.  Okay.  Well, that's interesting, but what is this document?

14   A.  So this document is from Carla Jenkins (phonetic).  This is

15   a lady that I was redoing a back patio for.  And she did not

16   like something and asked me not to come back.  And then she

17   didn't pay me this money but asked me for it.

18   Q.  Okay.  So is this a docket of a lawsuit that was filed

19   against you personally?

20   A.  It — I have — yes, but I have a hard time even recognizing

21   this.  When I called the courthouse, if I didn't have a lawyer,

22   they would not even have remembered that I was there.

23   Q.  Okay.  I'm not sure what you're trying to say by that, but —

24   A.  This —

25   Q.  No, no, it's okay.

*Kennedy - Direct/Hoffman*                                64

1    A.   Okay.

2    Q.   All right.  So —

3    A.   I'll ask —

4    Q.   — so this is — this is then a record that there was at least

5    one lawsuit against you personally, in contradiction to what you

6    just said, correct?

7              Yes or no.

8    A.   It should not have been.

9    Q.   Sir, is it — is it a record of a lawsuit —

10   A.   My name is on there, yes.

11   Q.   — filed against you?

12   A.   No.  It was filed — it should have been filed against the

13   company.  It was grossly taken care of and that's how my name

14   got on there.

15   Q.   Okay.  And what about this document here which appears to be

16   a lawsuit filed by Fitzpatrick, Lentz & Bubba against yourself

17   as well as DSK; do you recognize that matter?

18   A.   I recognize Fitzpatrick, Lentz & Bubba.  I also recognize

19   that they were the counsel for DSK Property Services and that my

20   name was added to it.

21   Q.   But this is a lawsuit against you personally by Fitzpatrick,

22   Lentz & Bubba, correct?

23   A.   See, I — I — I don't — I mean I don't know everything.  I'm

24   not going to say I do.  But I see that as Fitzpatrick, Lentz &

25   Bubba trying to sue two separate entities, so it would be like

*Kennedy - Direct/Hoffman*                                                      65

1    two separate people.

2    Q.   And one of those people is you, correct?

3    A.   One of those people is me, yeah.

4    Q.   So why did you say that you did not remember, given that

5    this is in 2023, why did you say you didn't — you had never been

6    a party to any lawsuit personally?

7    A.   Never — I never considered it.

8    Q.   You didn't consider this a lawsuit?

9    A.   No.  No.  This was over work that was never done.  I asked

10   them for direct receipts of what it was that they did.  They

11   could not produce them on any way, shape, or form.  And then I

12   personally went through bankruptcy, the company went out of

13   business.  I don't know what to do.  No, I never — I — this — I

14   apologize.

15   Q.   Okay.  And, just to clarify, Fitzpatrick, Lentz & Bubba were

16   your prior attorneys?

17   A.   They were.  And I did — I — yeah.

18        MS. HOFFMAN:  Okay.  And one more.  This was

19   previously marked as Exhibit P-14, another rebuttal exhibit.

20        MR. LAPUTKA:  No objection, Your Honor.

21        THE COURT:  Okay.

22   BY MS. HOFFMAN:

23   Q.   All right.  So, Mr. Kennedy, I'm going to show you what's

24   been previously marked as Exhibit P-14.  Do you recognize — what

25   is this here?

*Kennedy - Direct/Hoffman*                                                    66

1   A.   Yeah, I do.

2   Q.   What is it?

3   A.   It says KP Investments, LLC, plaintiff, versus Mark L.

4   Kennedy, individual — individually and trading as DSK Property

5   Services and DSK Property Services, LLC.

6   Q.   Thank you.  And so do you know what this document

7   represents?

8   A.   This document represents the lawsuit that came against my

9   company from a client that during Covid said that I wasn't

10  producing fast enough.

11  Q.   Okay.  And I know you say it's against your company, but you

12  do see that it also says Mark Kennedy, individually, correct?

13  A.   I — again, this was a contract that was through the company.

14  I'm pretty sure — I don't know how they do it, I don't know —

15  understand everything, but this — this lawsuit does not exist

16  anymore.  I don't know what to say.

17  Q.   So on — I'm turning to this page, which is the verification,

18  did you sign this verification?

19  A.   (Perusing document.)  These don't go together.

20  Q.   Sir, —

21  A.   These — they don't, no, they don't.  Yeah, I can see.  This

22  is one of the reasons why I didn't work with Lentz & Bubba ever

23  again.  This is from Lentz & Bubba, and you're putting it as DSK

24  Property Services versus KP Investments, and that's not true.

25  Q.   Sir, — okay, let's go back.  So you see here on the first

1   page, which is specifically the first page of this filing,

2   right?

3   A.  Yes.

4   Q.  So you see at the top where it's got the court's stamp and

5   it's got the docket number there, 2021C2265 —

6   A.  Yes, I do.

7   Q.  Okay.  And then turning to the verification page, do you see

8   that that's the same docket number 2021C2265?

9   A.  Why wouldn't that be there?  That wouldn't be there —

10  Q.  Sir, —

11  A.  — because Lentz & Bubba was my lawyer at that time, during

12  this; why wouldn't that be there?

13  Q.  Maybe I misunderstood your last response.  I thought you

14  were saying that this verification didn't go with the filing and

15  it shouldn't have been there.

16  A.  It should have been with Lentz & Bubba because that's what I

17  signed, not with the — not with KP Investments.

18          MR. LAPUTKA:  Your Honor, again I'm going to object to

19  the relevancy.  I think we're lost in the weeds here.  She's

20  asking of a verification that was attached to a response was

21  signed by Mr. Kennedy, and we're not even talking about that

22  anymore.  We're talking — I'm confused as to how this is

23  relevant.

24          MS. HOFFMAN:  Well, we should be talking about it,

25  but —

*Kennedy - Direct/Hoffman*                                                      68

1          MR. LAPUTKA:  I mean you're offering this for the

2     credibility of my client stating that he's never been involved

3     in a lawsuit.  What does this have to do with that?

4          MS. HOFFMAN:  This shows that he was involved in a

5     personal lawsuit and he knew about it because he signed the

6     verification, although he's claiming that he —

7          MR. LAPUTKA:  Your Honor, we've done this — this is

8     the third one and the fourth one now.  Clearly his response

9     every time is that he believes that these are company debts and,

10    yeah, maybe he's on it as well.  I don't know that we need to

11    continue down this path.

12         THE COURT:  Okay.  I am — I'm going to say that with

13    regard to this issue, I think that we've already — it's been

14    asked and answered now three times.  I understand that more than

15    once makes sense for your argument, but I'm going to leave it

16    there.  I don't think that we need to go down any further this

17    line of questioning.

18         MS. HOFFMAN:  Understood, Your Honor.  And so the only

19    other question I had in regards to this document for Mr.

20    Kennedy:

21    BY MS. HOFFMAN:

22    Q.  Are you able to see this page of your answer or the answer

23    that was filed by you and your company?

24    A.  Am I able to see it?  Yes.

25    Q.  Okay.  And is it correct to say that there was an account of

*Kennedy - Cross/Laputka*                                                    69

1   fraud that you responded to in this lawsuit?

2   A.  The company terminated me, so it —

3   Q.  Sir, please —

4   A.  — shows the same as this was —

5   Q.  — please answer the question.

6   A.  Yes.

7           MS. HOFFMAN:  Okay.  Thank you.

8           Your Honor, that's all the questions I have for Mr.

9   Kennedy.

10          THE COURT:  Okay.  Mr. Laputka.

11                      <u>CROSS-EXAMINATION</u>

12  BY MR. LAPUTKA:

13  Q.  Mr. Kennedy, how long was your company open and operating?

14  A.  Six, seven years.

15  Q.  In that seven-year period, how many jobs did you do?

16  A.  A lot.

17  Q.  Could you —

18  A.  I — I couldn't — a lot.  If I was to say a number, I

19  couldn't.  Some were big, some were small.

20  Q.  I'm not asking about the size of the jobs or the dollar

21  amount.  I'm asking how many jobs a year did you do for seven

22  years?

23  A.  Oh, probably a hundred a year.

24  Q.  Okay.  So —

25  A.  A lot.

*Kennedy - Cross/Laputka*                                    70

1   Q.  And in doing 700 jobs over seven years, it was just

2   represented that there were three, and this being the fourth,

3   lawsuit against you or the company with relation to your work

4   product or DSK's work product; is that correct?

5   A.  Correct.

6           MS. HOFFMAN:  Objection.

7           THE COURT:  What — I'm going to ask you not to answer

8   until I deal with the objection.

9           THE WITNESS:  Sorry.

10          THE COURT:  That's okay.

11          What was —

12          MS. HOFFMAN:  The objection —

13          THE COURT:  — the objection?

14          MS. HOFFMAN:  There has been no claim that these were

15  the only lawsuits filed in that time period.

16          MR. LAPUTKA:  That's fine, Your Honor.

17          THE COURT:  Okay.

18  BY MR. LAPUTKA:

19  Q.  When you stated earlier that you didn't think you had been

20  sued, were you referring to the fact that these lawsuits all

21  pertain to the company?

22  A.  Yes.

23  Q.  But there is a distinction that you now realize, that in

24  some of these suits or in all of the ones you were shown, that

25  you were also personally named?

*Trial*                                                          71

1    A.  Yes.

2              MR. LAPUTKA:  Okay.  I have no further questions in

3    the plaintiff's case in chief, Your Honor.

4              THE COURT:  Ms. Hoffman, do you have any redirect?

5              MS. HOFFMAN:  No, Your Honor.

6              THE COURT:  Okay.  You can step down, Mr. Kennedy.

7              THE WITNESS:  Thank you.

8              THE COURT:  Um-hum.

9         (Witness excused.)

10             THE COURT:  Okay.  We're over here.

11             MS. HOFFMAN:  With the submission of — I'm just going

12   through which exhibits it was exactly — okay, with the

13   submission of the Exhibits P-1 and then P-3 through P-7, as well

14   as I believe — I don't know if it's appropriate to offer the

15   exhibits I referred to from the defense.

16             MR. LAPUTKA:  I mean I think we went through all of

17   those —

18             MS. HOFFMAN:  Yeah.  So —

19             THE COURT:  Yeah.  I think that that's fine, —

20             MS. HOFFMAN:  — exhibits —

21             THE COURT:  — I think they were going to offer them,

22   so.

23             MS. HOFFMAN:  — introduce — sure.  And I shall say

24   P-10 through 14, I believe it was, the rebuttal.  One moment

25   there, Your Honor.

*Trial*                                                                      72

1          THE COURT:  10 I think is a deposition transcript.

2          MS. HOFFMAN:  Okay.  So P-...

3          THE COURT:  I think.  You didn't say, so it —

4          MR. LAPUTKA:  Your Honor, I would object to the

5    admission of any exhibits that we didn't use.

6          MS. HOFFMAN:  No, I understand.

7          MR. LAPUTKA:  Okay.

8          MS. HOFFMAN:  Yeah, so I'm just trying to figure out —

9          THE COURT:  Yeah.  I think we —

10         MS. HOFFMAN:  So I think it was P- — P-12, 13, and 14.

11   I think those were the three.

12         THE COURT:  12, I think is the — that I did not see.

13   That's the LLC —

14         MS. HOFFMAN:  Oh, I'm sorry, Your Honor.

15         THE COURT:  That's okay.

16         MS. HOFFMAN:  So 13 and 14 in addition to the ones I

17   already mentioned.

18         THE COURT:  Yes, 13 and 14, okay.

19         MS. HOFFMAN:  And, with that, we would rest.

20         THE COURT:  Are there objections to P-1, P-3 through

21   7, or P-13 and 14?

22         MR. LAPUTKA:  No, Your Honor.

23         THE COURT:  Okay.  Then I presume you're not objecting

24   to your own exhibits, A through D?

25         MR. LAPUTKA:  Correct, Your Honor.

*Defendant's Motion for Judgment on Partial Findings*                73

1          THE COURT:  All right.  So they'll be admitted.

2       (Plaintiff's Exhibits 1, 3 through 7, and 13 and 14, and

3    Defendant's Exhibits A through D received in evidence.)

4          THE COURT:  Okay.  All right.  Mr. Laputka.

5          MR. LAPUTKA:  Your Honor, at this point, pursuant to

6    Federal Rule of Civil Procedure 52©, I would like to make a

7    motion for — I'm trying to think of what it's called, it is

8    partial — partial judgment — judgment on partial findings.

9    That's what it is.  52© is judgment on partial findings.

10          The reason I would seek judgment on partial findings,

11   in advancement of my motion, is the fact that we are here today

12   for a fraud claim against my client personally.  I would argue

13   that at this point there has been no evidence put before the

14   Court that my client had any personal debt owed to the

15   plaintiff, number one.  Number two, there's also been no —

16   nothing to prove fraud on behalf of my client.

17          There's been no discussions about piercing the

18   corporate veil, there's been nothing that shows that he

19   mismanaged the money.  In fact, the only evidence before the

20   Court is that there was a contract signed, my client showed up

21   or had his employees show up, did some work, some paystubs that

22   he paid to employees, some testimony that some of the work was

23   done.  And then what appears happened, by her own emails, was

24   that Ms. Berrian decided to go in a different direction.

25          What I would surmise from the testimony this morning,

*Defendant's Motion for Judgment on Partial Findings*                    74

1   if you look at the evidence presented, there was an extensive

2   remodel to make this house substantially different, modern,

3   newer, nicer, whatever.  And then allegedly a friend or somebody

4   counseled her that there were all these problems with the home.

5   So she decided that she wanted to take the x amount of dollars

6   that she was going to do on a remodel and do it on repairs of

7   the systems of the home.

8          There was no fraud in the inducement of this debt,

9   which is required to be proven by the plaintiff whatsoever.  My

10  client was referred to her by people who he did a good job for,

11  at least at the beginning that's what she thought.

12         He testified that he did a hundred jobs a year for

13  seven years.  And, yes, a couple of lawsuits along the way.  I

14  would argue that that's the cost of doing business.  You can't

15  make a hundred percent of the people happy a hundred percent of

16  the time.

17         But by her own admission, she signed the contract with

18  the company.  He started work.  A month later she decided she

19  was going in a different direction.  And by that in the

20  documents, it was changing the scope from making the house

21  pretty to making the house safe, because she only had x amount

22  of dollars.  That is not my client's problem.  That is not

23  fraud.

24         If you take a look at the exhibit that we presented

25  with the options, it has a breakdown of exactly why my client

*Defendant's Motion for Judgment on Partial Findings*                    75

1    kept the money.  My client pulled guys off other jobs, as it

2    states right in the exhibit that was offered into evidence by

3    the Plaintiff — on my behalf, obviously.  But he was there

4    ready, willing, and able, and she chose to do something else.

5    You can't unilaterally break a valid contract.

6           She asked for change orders.  Through her own

7    testimony, my client offered change orders and said, yeah, sure,

8    we can do all that stuff.  Here's how much it costs.  And then

9    she went, whoa, that's too much.  It has nothing to do with DSK

10   Properties, LLC.

11          And further than that, it has absolutely nothing to do

12   with my client.  On my client's petition, as filed with this

13   Court, he had this entire matter listed as disputed, the debt

14   being disputed.  At no point does he recognize this is a valid

15   debt, other than possibly saying, sure, I'll give you the 1400

16   bucks back because here is all the work I did and the result of

17   a net 1400 to you, to which the Plaintiff did not accept.  She

18   didn't even respond, by her own testimony.

19          So, Your Honor, at this point I think we have to have

20   judgment in my favor, not only judgment in my client's favor for

21   the Plaintiff's failure to make out a case and to prove her

22   case, but also under 523, my client's entitled to attorney's

23   fees for this harassment.  My attorney's fees should be paid and

24   all of the Defendant's costs in defending this adversary

25   proceeding should be born by the Plaintiff.

*Defendant's Motion for Judgment on Partial Findings*                    76

1          Thank you, Your Honor.

2          THE COURT:  Ms. Hoffman.

3          MS. HOFFMAN:  Yes, Your Honor.  Thank you.

4          Your Honor, obviously we would oppose that.  We

5     believe that Ms. Berrian has proven by clear and convincing

6     evidence that the debt, existing debt, yes, was incurred by

7     fraud.  And I can go through a detailed reiteration of the

8     testimony that we've heard so far today, but to sum it up, Mr.

9     Kennedy made these representations to Mr. Berrian — Ms. Berrian

10    that he would complete the work agreed upon.  And he has not

11    presented or does not appear to be going to present any

12    witnesses other than himself to corroborate his claims of

13    expenditures on time or materials.

14         He made those representations to her with recklessness

15    as to their truth or falsity.  He clearly had a reckless

16    disregard in that — making that area.  He didn't even bother to

17    apply for permits.  He covered the windows so the work could not

18    be seen.  He, in fact, told Ms. Berrian he was not going to be

19    applying for permits.  He did not sign the contract.  He said he

20    honestly never signed contracts, you know, which is a violation

21    of HICA for a valid contract.

22         As the owner of DSK, he did not advise her as a

23    creditor of her rights to file a claim.  He has previously been

24    sued for fraud personally and then proceeded today to lie about

25    that under oath.

*Defendant's Motion for Judgment on Partial Findings*                    77

1          And, as far as the inducement, if he had not made

2     those representations, she never would have entered into the

3     contract with him.  She relied on those representations and her

4     damages are $44,172.50.  She — he then of course refused to

5     return the money, as he said, despite having completed a mere

6     five hours of work, as he testified, as the worker that Ms.

7     Berrian testified was there, Terrance Myers, and again no

8     evidence was presented to show that there were other workers at

9     the property.  And Ms. Berrian testified that there were no

10    others, he was making $12.50 an hour.  If he was there for five

11    hours, the quantum meruit here is — is not anywhere near what

12    the Defendant is claiming.

13         He — in his response to Ms. Berrian where he says that

14    he would refund 1,400 or 1,500, is absurd.  He put out — we all

15    saw the photos of the sum total of what was done on her house.

16    So, yes, obviously we're disputing that there was not a debt.

17    We believe he did incur a debt personally.

18         And just to note on the piercing of the corporate

19    veil, Mr. Kennedy did raise preliminary objections to that in

20    the Common Pleas matter on the same issue, and those were

21    overruled and allowed to proceed.  Of course then he — that

22    matter was stayed because of this instant proceeding.

23         So I would argue also res judicata just that that has

24    been allowed to proceed by another court and that if the Court

25    wanted to order supplemental briefing on that matter, we could

*Defendant's Motion for Judgment on Partial Findings*                    78

1    do that, but that should not prevent the Court from finding

2    against Mr. Kennedy personally.

3            And he testified repeatedly that he is not aware of

4    the requirements of an LLC despite forming one.  He is not aware

5    of what has to be done in dissolution.  He didn't notify my

6    client that she was a creditor even though that judgment was

7    entered before the supposedly dissolution, although I know that

8    counsel disputes that it was even the result.

9            So there is just a pattern here of playing fast and

10   loose with his obligations.  And, again, fraud of course is a

11   high burden; and the intent, his — of course you're very

12   unlikely to have somebody say, yes, I intended to commit fraud.

13   So it has to be inferred from his actions and previous other

14   cases and in this case in his dealing with Ms. Berrian, he had a

15   pattern here of continually promising her that he was going to

16   do work by a certain time and then not following through.  And

17   then having her continue to pay him money when he would make

18   more promises again, and again failing to follow through.  So

19   it's no wonder she eventually got sick of it and didn't trust

20   him to do the additional work that he was quoting her for, much

21   less what she had already contracted for.

22           So therefore, Your Honor, that we would definitely

23   oppose this motion by Defendant.

24           THE COURT:  Well, let me ask you this.  Tell me what

25   the basis is for the debt against Mr. Kennedy as opposed to DSK?

*Defendant's Motion for Judgment on Partial Findings*                              79

1  Because I'm not sure that I heard that from the testimony that's

2  been provided so far.

3        MS. HOFFMAN:  Understood.  Understood, Your Honor.

4        THE COURT:  So tell me what your theory of liability

5  is here, because I'm not quite sure that it's been met.  If it's

6  piercing the corporate veil, I didn't hear anything that would

7  lead me to believe that that happened.  Unless there's some

8  other theory that you're relying on, tell me why I should find

9  that there is a debt against him personally.

10        MS. HOFFMAN:  Well, Your Honor, DSK was an LLC but it

11  was, as I said, Mr. Kennedy was the sole owner.  He was not

12  complying with the requirements of an LLC.  He has said

13  variously that it's been closed down, that it's being dissolved.

14        THE COURT:  But what specifically was he not complying

15  with when they entered into the contract, which I think is where

16  you need to go in terms of piercing the corporate veil?

17        MS. HOFFMAN:  So at that time he, again, did not — no

18  one from DSK signed the contract.  He personally represented to

19  Ms. Kennedy — to Ms. Berrian repeatedly that work would be done.

20  You know, no one else — there was no one else from DSK

21  representing this to her.  It was all Mark Kennedy.  And it's

22  inextricable, his actions, his promises, his history, it's

23  impossible to extract that from DSK, because even though

24  formally it was an LLC, he's again presented — not that it's he

25  hasn't had the opportunity, but in discovery, as I say, he has

*Defendant's Motion for Judgment on Partial Findings*                    80

1   not presented any evidence of what DSK did to actually follow

2   through on Ms. Berrian's work request.  So the payments that she

3   made, expenditures, any work that was done specifically on her

4   house has not been presented at any point and by the Defendant.

5   So she — you know, it's impossible to say that he is not liable

6   because DSK was basically a formality at this point.  He was the

7   one making these promises, inducing her to pay money, and DSK

8   itself was just a legal fiction.

9            THE COURT:  All right.

10           MR. LAPUTKA:  Your Honor, I don't believe there was —

11           THE COURT:  This is what I want to do —

12           MR. LAPUTKA:  — any evidence or testimony —

13           THE COURT:  Hold on.

14           MR. LAPUTKA:  — of any of that.

15           THE COURT:  This is what I want to do.  I'm going to

16   reserve my decision on that motion because I'm going to give the

17   parties the opportunity to brief the issue of participation

18   theory or piercing the corporate veil.

19           At this point, I don't think that I have enough in

20   front of me to make a decision on your motion.

21           I'd like to give you both an opportunity to at least

22   brief those — those two issues so that I can make an informed

23   decision about what has been presented and whether or not it

24   meets those — those burdens.

25           So since I am going to reserve on that, I am however

*Defendant's Motion for Judgment on Partial Findings*                    81

1    going to allow you to present whatever evidence you would like

2    to with the understanding that we can either do that today or we

3    can wait until after briefing and have you come back, but I'd

4    prefer that you not have to do that.

5         MR. LAPUTKA:  Can I confer with my client for a

6    minute, Your Honor?

7         THE COURT:  Yes.

8         MR. LAPUTKA:  Because I believe it's a little bit

9    detrimental if I move forward —

10        THE COURT:  Right, —

11        MR. LAPUTKA:  — without a hearing on this motion but

12   also none of us want to come back, so —

13        THE COURT:  Understood.

14        MR. LAPUTKA:  — can we confer for a minute?

15        THE COURT:  Absolutely.

16        MR. LAPUTKA:  Thank you, Your Honor.

17        THE COURT:  All right.  We'll go off the record.

18      (Recess taken from 11:47 a.m. to 12:06 p.m.)

19        THE CLERK:  All rise.  Court is now in session.

20        THE COURT:  Okay.

21        MR. LAPUTKA:  Thank you, Your Honor.

22        THE COURT:  Tell me what we've come up with.

23        MR. LAPUTKA:  After a discussion with my client, we

24   would like Your Honor to rule on the motion before we do our

25   case in chief.  And, as reluctant as we are to come back another

*Defendant's Motion for Judgment on Partial Findings*                                    82

1  day, hopefully that won't be necessary.

2          THE COURT:  Understood.

3          MR. LAPUTKA:  Thank you.

4          THE COURT:  Okay.  So if I — well, let's put it this

5  way.  Do you want to have responsive time or did you both want

6  to brief at the same time?  Like do you want me to set this up

7  so that the Plaintiff files her brief and then you get time

8  after that to come in or do you want to do it at the same time?

9  I'm just trying to figure out time.

10         MR. LAPUTKA:  I would like some time after but not

11 much.

12         THE COURT:  Got it.  Okay.  All right.

13         So, Ms. Hoffman, 30 days?

14         MS. HOFFMAN:  Thirty days would be fine, Your Honor.

15         THE COURT:  Okay.  And then?

16         MR. LAPUTKA:  Forty-five?  Not from then, from now.

17         THE COURT:  Yeah, got it.  Okay.

18         I will put that on the docket and we'll go from there.

19 Once I make that decision, I think it becomes sort of either an

20 all or nothing proposition at that point.  So once I have them,

21 hopefully I will make that decision pretty quickly and we can

22 decide where we go.

23         MR. LAPUTKA:  Okay.

24         THE COURT:  All right.  Thank you, all.

25         MR. LAPUTKA:  Thank you, Your Honor.

*Defendant's Motion for Judgment on Partial Findings*                83

1          MS. HOFFMAN:  Thank you, Your Honor.

2          THE CLERK:  Okay.  That concludes the list for today.

3          THE COURT:  All right.  We can go off the record.

4     (Trial was adjourned at 12:07 o'clock p.m.)

5                          —o0o—

State of California          )
                             )     SS.
County of Stanislaus         )


        I, Susan Palmer, certify that the foregoing is a true

and correct transcript, to the best of my ability, of the above

pages, of the digital recording provided to me by the United

States Bankruptcy Court, Eastern District of Pennsylvania, Clerk

of the Court, of the proceedings taken on the date and time

previously stated in the above matter.

        I further certify that I am not a party to nor in any

way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber

by the American Association of Electronic Reporters and

Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer

Reporting Services is approved by the Administrative Office of

the United States Courts to officially prepare transcripts for

the U.S. District and Bankruptcy Courts.


                              Susan Palmer
                              Palmer Reporting Services
                              2129 Golden West Lane
                              Modesto, California  95350
                              (209) 915-3065

                              Dated October 17, 2024